IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.  Criminal No. 2:16-cr-00146

STEVEN EUGENE ADKINS

**DEFENDANT STEVEN ADKINS'S MEMORANDUM IN AID OF SENTENCING**

Defendant Steven Eugene Adkins, through the undersigned counsel, hereby submits this memorandum to address the factors the Court will consider in fashioning a sentence for Mr. Adkins that is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

There remain a few disputes of fact as reflected in the first addendum to the Presentence Report. However, these disputed matters should not affect sentencing, and unless the Court disagrees with that conclusion and intends to consider them as part of sentencing Mr. Adkins, he does not intend to press them further. *See* Fed. R. Crim. P. 32(i)(3)(B). The parties and the United States Office of Probation are in agreement that the U.S. Sentencing Guidelines recommend a Zone D sentence in the range of 87 to 108 months followed by 1 to 3 years of supervised release. Presentence Investigation Report (PSR) ¶¶ 124, 128. However, Mr. Adkins respectfully requests that the Court sentence him to no more than 60 months, or 5 years, in prison. This sentence would satisfy the goals of § 3553(a) for the following reasons.

**I.  The Proposed Sentence Would Take into Account Mr. Adkins's Personal History**

Mr. Adkins's mother and father separated when he was a young child. PSR ¶ 99. His father lived close-by, but still played little role in raising Mr. Adkins, and did not develop a

relationship with him. *Id.* Mr. Adkins's mother was an alcoholic. *Id.* 102. His basic needs were met, and in his view, he had a "decent childhood," *id.*, but her alcoholism led to violence. When his mother drank, fights between her and Mr. Adkins's step-father were more apt to occur, and these fights often led to emotional and physical abuse toward her. Mr. Adkins recalls that, on one occasion, when he was approximately 13, one such fight led to his mother hitting her head on a brick pathway and having what he, in retrospect, thinks was a seizure. In roughly the same period, she tried to kill herself with pills. Mr. Adkins's step-father also regularly abused young Mr. Adkins, PSR ¶ 102, including when he would object to his step-father's abuse of his mother. Only when young Mr. Adkins could physically defend himself at around the age of 16 did the abuse stop, and he soon left home. *Id.* ¶¶ 102-103. This upbringing led him to often feel that his family did not love him and that his family did not support each other. He was often absent from school and left during his second attempt at completing the 10th grade because, he says, he did not like it. See PSR ¶ 115. It is hard to imagine that his home life did not contribute to that, or that it did not contribute to the fact that – at around the same time that he was moving out of his mother's home and quitting school – he started drinking and began a years-long regular marijuana habit, moving quickly into the daily methamphetamine habit that so clearly played a role in this case. *Id.* ¶ 113.

Indeed, it is hard to imagine that these factors in his upbringing did not negatively impact his development and conduct as an adult in myriad ways, and research bears out that common sense conclusion. The Adverse Childhood Experiences ("ACE") Study was one of the largest investigations undertaken to assess the health and social effects of adverse childhood experiences

throughout the lifespan of its approximately 17,000 participants. Ex. A at 5.[1] The Study is an ongoing collaboration between the federal Centers for Disease Control and Prevention and the private insurance company, Kaiser Permanente. The original participants in the Study consisted of primarily college educated, middle class adults who lived in the San Diego area of California. *Id.* at 5. The study assessed the participants' responses to ten categories of stressful or traumatic childhood experiences. Ex. B.[2] The results of this test disclosed "a stunning link" between the incidents of childhood trauma and chronic diseases, as well as long term social and emotional problems that develop later during that person's adult years. Ex. A at 10-14; Ex. B at 3-4. As a person's ACE score increases to four or more points, the risk of disease, social and emotional problems incurred during adulthood significantly increase as well. Ex. B at 5-10. The results of the ACE study have been analyzed extensively by numerous sociologists and medical professionals and the study is frequently cited as a landmark study in the field of epidemiological research. Ex. A at 19. Locally, the Kanawha County Health Department recently released the results of their ACE study involving 506 West Virginia residents. Ex. C.[3] This study showed that more than a quarter of respondents reported that they had four or more stressful or traumatic experiences during their childhood. Ex. C. Mr. Adkins's responses to the ACE test would show

---

[1] A copy of "The Health and Social Impact of Growing Up with Adverse Childhood Experiences" written by Dr. Robert Anda, one of the principal investigators for the ACE Study, has been attached as Exhibit A. It and other information about the ACE Study are available http://www.acestudy.org (last visited Dec. 7, 2016). The Centers for Disease Control continues to track the status of the San Diego participants, as seen at http://www.cdc.gov/violence prevention/acestudy/about.html (last visited Dec. 7, 2016).

[2] The ten questions are set forth in "Got your ACE Score?," which is attached as Exhibit B and available at http://acestoohigh.com/got-your-ace-score/ (last visited Dec. 7, 2016).

[3] A copy of a December 10, 2015 Charleston Gazette-Mail article about the study is attached as Exhibit C.

that he had seven positive results, which would place him in a high risk category for developing the above noted health and behavior problems during his adult life.[4]

One of the most important findings of the ACE study is that stressful and traumatic childhood experiences result in "toxic stress" which damages the development of a child's brain structure and function. Ex. A at 14; Ex. B at 10. A 2005 article written by the National Scientific Counsel on the Developing Child at Harvard University concluded that prolonged and repeated instances of toxic stress on a child lacking access to a caring adult can have an adverse impact on brain architecture and in extreme cases, result in the development of a smaller brain. Ex. D.at 1.[5] The article further concluded that "[f]requent or sustained activation of brain systems that respond to stress can lead to heightened vulnerability to a range of behavioral and physiological disorders over a lifetime." *Id.* at 2. These undesirable outcomes can include mental stress-related disorders (drug abuse, alcoholism, anxiety disorders) as well as physical health problems. *Id.*

These findings are consistent with and amplify upon other research about the impacts of domestic violence and alcoholism on child development. According to the *American Family Physician* article "Witnessing Domestic Violence: The Effect on Children," children who witness violence in the home and children who are abused may display many similar psychologic effects.

---

[4] Mr. Adkins answers yes to Questions 1 (mental abuse and threats from mother's step-father); 2 (physical abuse); 4 (feeling unloved and lack of support); 6 (parents divorced); 7 (witness of physical abuse to mother); 8 (living with an alcoholic); and 9 (mother's attempted suicide).

[5] A copy of "Excessive Stress Disrupts the Architecture of the Developing Brain" has been enclosed as Exhibit D and is available at http://developingchild.harvard.edu/wp-content/uploads/2005/05/Stress_Disrupts_Architecture_Developing_Brain-1.pdf (last visited Dec. 7, 2016)

Ex. E.[6]  These children are "at greater risk for internalized behaviors such as anxiety and depression and for externalized behaviors such as fighting, bullying, lying, or cheating." *Id.*  They are more disobedient, more likely to have lower social competence, "poor school performance and difficulty in relationships with others." *Id.*[7]  Likewise, as summarized in another article, "Effects on Children of Alcohol Dependent Parents," studies have found that "nearly all children from alcoholic families are at risk for behavioral and emotional difficulties and live with scars – psychological and physical – as a result of parental alcoholism." Ex. F.[8]  These can include greater propensity toward addiction, "learning and memory problems[, and] vulnerabilities in behavioral control and aggression in adulthood." *Id.*

In short, a review of Mr. Adkins's childhood and shows that, during critical periods of brain and social formation, he was in an environment that was rampant with the sorts of stressors that research suggests surely had a lasting impact on his development.  Predictably, he headed down the same path of substance abuse that his mother did.  That substance abuse escalated to a significant daily methamphetamine habit that contributed to the conduct that brings him before the Court.  The defense respectfully submits that the proposed sentence would reflect appropriate consideration of this personal history.

---

[6] Melissa M. Stiles, M.D., *Am. Fam. Physician*, "Witnessing Domestic Violence: The Effect on Children" (Dec. 1, 2002).  A copy of this is article is attached as Exhibit E and is available at http://www.aafp.org/afp/2002/1201/p2052 .html (last visited Dec. 7, 2016).

[7] The writer of this article notes that it can be difficult to determine whether witnessing abuse or other factors that often accompany that experience – including parental separation and direct abuse on the child – drive these outcomes.  See Ex. E.  Of course Mr. Adkins experienced parental separation and direct abuse as well, and in any case does not suggest that any one factor in his upbringing was determinative.

[8] This article appears on AlcoholAnswers.org and was last modified on Oct. 28, 2013. A copy of this is article is attached as Exhibit F and is available at http://www.alcoholanswers.org/alcohol-education/emotional-effects.cfm (last visited Dec. 7, 2016).

5

## II. The Proposed Sentence Would Fairly Reflect Mr. Adkins's Criminal History and the Seriousness of the Offense

In a short span of time in his early thirties, Mr. Adkins was twice convicted of possession with intent to distribute marijuana. PSR ¶¶ 79, 80. There is no indication that these distributions involved large quantities, and his recollection is that, together, they involved approximately 4 ounces of marijuana. He ultimately spent between 14 and 16 months in prison for the two convictions, combined. PSR ¶¶ 79, 80 (including pretrial detention). He did not receive any drug rehabilitation treatment in prison.

When he was released in 2012, he went back to work. (Mr. Adkins has maintained steady employment over several periods of his adult life, including a five-year stint at Save-a-Lot in the early 2000s that he forgot to note in his PSR interview. *See* PSR ¶¶ 117-119.) Sometime after completing parole, he went back to using methamphetamine, and although he faced no other charges until 2015, his use derailed any positive progress he had made. His use escalated to the point that he was using up to 3.5 grams a day at the time of his last arrest. PSR ¶ 113.

These two marijuana convictions are "double counted" in the U.S. Sentencing Guideline calculations applicable to this case. First, the convictions take Mr. Adkins out of criminal history category I and place him within category III. Second, as predicate "controlled substance offenses," the marijuana convictions also significantly enhance the offense level applicable to his felon in possession conviction, taking it from 14 to 24, and taking his total offense level to 27 instead of 17. U.S.S.G. § 2K2.1(a)(2); (a)(6); PSR ¶¶ 65-77. But for those two marijuana convictions, Mr. Adkins would be facing a guideline range of 24 to 30 months in prison instead of 87 to 108 months in prison (TOL 17/CHC I). If those convictions enhanced his criminal history but not his base offense level, he would be facing a guideline range of 30 to 37 months in prison (TOL 17/CHC III) instead of 87 to 108 months in prison.

Base offense level 24 overstates the seriousness of Mr. Adkins's offense insofar as that is a factor of his criminal history. The Sentencing Commission assigned this ten-level enhancement to the basic felon in possession base offense level to reflect its conclusion that it is more serious for those who have committed multiple controlled substance offenses to possess guns than it is for other felons to possess them. *See* U.S.S.G. App. C., amend. 374 (1991). But the spectrum of prior drug dealers to whom the enhancement applies includes a wide variety of people, and it is unreasonable to conclude that each presents equal additional risk or to otherwise treat them the same. On one end of the spectrum are distributers who have a history of shooting, using violence, or threatening violence to promote drug distribution, or others whose distributions were marked with other aggravating factors. Mr. Adkins's history reflects conduct at the opposite end of this spectrum. The applicable guidelines treat him the same as it treats offenders with much more serious histories. Pursuant to § 3553(a), the Court should not.

Possession of a weapon by a felon is a serious offense. It was all the more serious in this case given Mr. Adkins's simultaneous possession of methamphetamine and his flight from officers. This is all reflected in the six points-worth of specific offence characteristics and enhancements applicable pursuant to U.S.S.G. §§ 2K2.1(b)(6)(B) and 3C1.2, which he does not take issue with. PSR ¶¶ 66, 72. There is also no question that Mr. Adkins's distribution conduct has escalated: Methamphetamine is a more serious drug than marijuana (as reflected in culpability assigned to their distribution in U.S.S.G. § 2D1.1), and he was found in possession of a not insignificant quantity of the drug on January 14 of this year. However, the Court can take all of that into account, and still give serious weight to Mr. Adkins's prior convictions, without accepting that those convictions merit a 57 to 71-month jump in the applicable guideline range.

The proposed sentence of 60 months of imprisonment would be within the range that would apply if Mr. Adkins's base offense level were increased by 5 points in light of his criminal history, instead of by 10 points, making his base offense level 19 instead of 24, his adjusted offense level 25 instead of 30, and this total offense level 22 instead of 27 (yielding a range of 51-63 months for CHC III). Thus, the proposed sentence would account for the view that the prior offenses make the current offense more serious, but also take into consideration that the priors were comparatively minor distributions that he did not promote with violence of any kind, let alone gun violence. In short, the proposed sentence would more fairly reflect Mr. Adkins's individual history and the nature of his offense.

### III. The Proposed Sentence Would Protect the Public, Promote Deterrence, and Promote Rehabilitation

If the Court sentences Mr. Adkins to five years in prison, he will present no risk to public safety for a significant period of time. Moreover, he has never served federal time and never served anything close to five years in prison. As a result, he does not have a track record of failing to be deterred by significant sentences. This is grounds to conclude that if sentences of increasing severity can deter anyone, five years in federal prison can deter Mr. Adkins. The Court's anticipated warnings at sentencing about the impact of the career offender guidelines and the Armed Career Criminal Act should amplify that effect. In short, this jump in punishment will be sufficient but not greater than necessary to impress upon Mr. Adkins the serious consequences that flow from possessing a weapon or otherwise violating federal law, and the impact of recidivism; and it will send the same message to anyone else considering similar conduct.

Mr. Adkins will also serve a term of supervised release, during which he will be subject to close supervision and be subject to new prison terms and extension of his supervised release,

providing further deterrence.  This will also give Probation an opportunity to mandate treatment to address the drug abuse that is at the core of Mr. Adkins's offense history.

## CONCLUSION

WHEREFORE, for these reasons and such others as may be stated at the sentencing hearing on December 14th, and in light of the entire record, Mr. Adkins respectfully requests that the Court impose a sentence of no more than five years in prison.  Mr. Adkins does not intend to call any witnesses at sentencing and anticipates that the hearing should take no longer than thirty minutes.

Respectfully submitted this 7th day of December, 2016.

**STEVEN EUGENE ADKINS**

By Counsel

**CHRISTIAN M. CAPECE**
**FEDERAL PUBLIC DEFENDER**

**s/ Ann Mason Rigby**
**Ann Mason Rigby, WV Bar No. 13036**
**Assistant Federal Public Defender**
**United States Courthouse**
**300 Virginia Street, East, Room 3400**
**Charleston, WV 25301**
**Telephone: (304) 347-3350**
**Facsimile: (304) 347-3356**
**E-mail:  ann_rigby@fd.org**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**UNITED STATES OF AMERICA**

v.                                                                                Criminal No. 2:16-cr-00146

**STEVEN EUGENE ADKINS**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing **DEFENDANT STEVEN ADKINS'S MEMORANDUM IN AID OF SENTENCING** has been electronically filed with the Clerk of Court this date using the CM/ECF system and served upon opposing counsel as follows:

       **VIA CM/ECF:**                W. Clinton Carte
                                                   Assistant United States Attorney
                                                   United States Courthouse, Room 4000
                                                   300 Virginia Street East
                                                   Charleston, West Virginia 25301
                                                   E-mail: clint.carte@usdoj.gov

       **DATE**: December 7, 2016.                  **s/ Ann Mason Rigby**
                                                                **Ann Mason Rigby, WV Bar No. 13036**
                                                               **Assistant Federal Public Defender**
                                                               **Attorney for Defendant**
                                                               **United States Courthouse**
                                                               **300 Virginia Street, East, Room 3400**
                                                               **Charleston, WV 25301**
                                                               **Telephone: (304) 347-3350**
                                                               **Facsimile: (304) 347-3356**
                                                               **E-mail: ann_rigby@fd.org**